ALTENBURG *v.* SEARS, ET AL.

[No. 117, September Term, 1967.]

*Decided March 19, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Samuel F. Kenney,* with whom were *Robert J. Callanan, John L. Moring, Jr.* and *Callanan, Goff, Moring & Callanan* on the brief, for appellant.

*F. Gray Goudy,* with whom was *Herbert Burgunder, Jr.,* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

The question presented by the appeal in this tort action, arising out of the rear-end collision of an ambulance with an automobile that had stopped at a traffic signal is whether the trial court erred in denying the motions of the "automobile operator" for a directed verdict or a judgment *n.o.v.* against the "ambulance driver" and owner of the ambulance.

The accident occurred near the intersection of the Roscoe Rowe Boulevard with North Taylor Avenue in the northerly environs of Annapolis. It was daylight, the weather was clear and the roads were dry. Both the ambulance (an authorized emergency vehicle owned by the Arundel Volunteer Fire Department driven by the defendant-appellee Raymond R. Sears) and the automobile (operated by the plaintiff-appellant Robert C. Altenburg) were traveling in a southerly direction toward Annapolis. The boulevard at the place of the accident is a divided highway with two marked lanes in each direction and a third lane for southerly bound vehicles turning left at the avenue.

At the time of the accident, the ambulance was carrying a highway accident victim to the Anne Arundel County General Hospital. The ambulance driver, who had entered the boulevard from U.S. Route 50, sounded the ambulance siren from the time he left the main highway until the happening of the accident. The top of the ambulance was also equipped with a spinning red "beacon ray" which was functioning and red "tunnel lights" at each of the four corners which were on. There were ten to twelve motor vehicles ahead of the ambulance in the right-hand lane and four or five vehicles ahead of the ambulance in the left hand lane. The vehicles ahead of the ambulance in the slow or right lane promptly moved onto the gravel shoulder upon the approach of the ambulance, but the automobile operator, who was the last of several motorists in the fast lane ahead of the ambulance, apparently did not hear the siren or see the red lights and made no attempt to move out of the way. As soon as he could see that the way was clear, the ambulance driver moved over into the fast or left lane behind the automobile operator with the intention of entering the left turn lane which began approximately twenty-five to thirty feet (or two car lengths) from the intersection. The automobile operator

came to a stop at the intersection in obedience to the changing traffic control signal as another motor vehicle came to a stop in the slow lane along side of him. While the leading automobile was in a stopped position, the right front of the following ambulance collided with the left rear of the automobile as the ambulance driver was attempting to turn into the left turn deceleration or storage lane. The resulting damage to the respective vehicles was minimal but the automobile operator sustained an injury to his neck. After the accident the automobile operator, at the request of the ambulance driver, followed him to the hospital.

Three witnesses testified at the trial. The pertinent testimony of the patrolman (Officer Disney), who investigated the accident not at the scene but at the hospital (after each of the parties had informed him of their movements in approaching the intersection and as to the position of the respective motor vehicles when the accident happened) was to the effect that the automobile driver told him that he had come to a gradual stop and was waiting in the fast lane for the traffic signal to change from red to green when the accident occurred and that his statement was made in the presence of the ambulance driver who did not then contradict it.

The ambulance driver was called as a witness by the plaintiff and extensively examined. He testified that the traffic signal was green when he was between one hundred and one hundred and twenty-five feet from the intersection but had not noticed it again until after the accident; that in the meantime he began to brake the ambulance "gently" with the intention of making a left turn at the intersection; that there "was a little too much" going on for him to really observe it all; that when he was still some distance from the intersection he noticed that the automobile in front of him had stopped; that he had not then applied his brakes harder because he did not want to "shake up" the injured passenger; that he had not applied them sooner because he hoped the automobile driver would "pull-up" closer to the intersection so that he could "pull-into" the left turn lane but had been precluded from so doing by the automobile stopping too far from the intersection; and that, for that reason, he had not forcefully applied his brakes un-

til he was eight to ten feet from the stopped automobile. Although he had previously testified that the automobile had stopped suddenly when he was "trying to make this third lane," he admitted on redirect, when asked if he could have stopped had he applied the brakes "more strongly," that it was possible. In addition to testifying that he surmised, from the fact that the automobile operator had not reacted to the siren and flashing lights, that he had not heard or seen the ambulance, he stated that it was the policy of the fire department to stop at all red lights.

The automobile operator testified that he had applied his brakes approximately thirty-five or forty feet from the traffic light; that his stop had been a normal one and that he had been sitting at the light for "about thirty seconds or so" when he felt the jolt. Although the ambulance driver could not remember whether he had passed to the right or left of the automobile after the accident, the automobile operator, in reply to a question as to whether there was room enough between the rear of his automobile and the entrance to the left turn lane for the ambulance to enter it, stated that the ambulance driver backed up after the collision, went to the left of the automobile, asked the automobile driver to "follow [him] to the hospital" and led the way.

At the close of all the evidence, the motion for a directed verdict in favor of the plaintiff was denied, the case was submitted to the jury on instructions which were not excepted to [1] and the jury returned a verdict in favor of the defendants. When the trial court denied the motion for a judgment *n.o.v.* or, in the alternative, for a new trial and entered a judgment for costs, the plaintiff appealed.

The trial court erred in denying the motion for judgment *n.o.v.* On motions for a directed verdict or for judgment *n.o.v.*, as the case may be, if the evidence, considered in the light most favorable to the party against whom the motion has been made, is capable of only one conclusion, the motion should be granted.

---

1. The plaintiff excepted to the original charge with respect to the doctrine of last clear chance, but when the trial court fully instructed the jury in this regard no further exceptions were taken.

*Dunnill v. Bloomberg,* 228 Md. 230, 179 A. 2d 371 (1962); *Garozynski v. Daniel,* 190 Md. 1, 57 A. 2d 339 (1948).

Under several of the provisions of the motor vehicle law, the drivers of emergency vehicles are given the right of way and excused from obeying certain rules of the road—see §§ 183 (b) and (c), 214 and 235(a) of Article 66½ [2]—but the drivers of such vehicles are not relieved from using due care for the safety of others. These statutory due care requirements have been interpreted to mean that the drivers of emergency vehicles are

---

**2.** Section 183 (b) and (c), concerning the stopping of emergency vehicles at stop signals and signs, provide:

"(b) *Emergency vehicles—Stopping.*—The driver of any authorized emergency vehicle when responding to an emergency call upon approaching a red or stop signal or any stop sign shall slow down as necessary for safety but may proceed cautiously past such red or stop signal or stop sign. At other times drivers of authorized emergency vehicles shall stop in obedience to a stop sign or signal.

"(c) *Same—When special privileges may be assumed.*—No driver of any authorized emergency vehicle shall assume any special privilege under this article except when such vehicle is operated in response to an emergency call or in the immediate pursuit of an actual or suspected violator of the law."

Section 214, as to when speed restrictions are applicable to emergency vehicles, provides:

"The prima facie speed limitations and provisions relative to right-of-way stopping at through highways, rules of the road, traffic-control devices and signals set forth in this article shall not apply to authorized emergency vehicles when responding to emergency calls and the drivers thereof sound audible signal by bell, siren, or exhaust whistle. This provision shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the street, nor shall it protect the driver of any such vehicle from the consequence of a reckless disregard of the safety of others."

Section 235(a), concerning the right-of-way of emergency vehicles, provides:

"(a) *Vehicles.*—Upon the immediate approach of an authorized emergency vehicle, when the driver is giving audible signal by siren, exhaust whistle, or bell, the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the highway clear of any intersection and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer."

liable for ordinary negligence (though their conduct may not be measurable by the same yardstick as is applicable to drivers of conventional vehicles) and must use reasonable care under the circumstances. *M. & C. C. of Baltimore v. Fire Insurance Salvage Corps,* 219 Md. 75, 148 A. 2d 444 (1959); *Martin v. Rossignol,* 226 Md. 363, 174 A. 2d 149 (1961). See also *Baltimore Transit Co. v. Young,* 189 Md. 428, 56 A. 2d 140 (1947).

Thus, even though the drivers of authorized emergency vehicles are given special privileges under § 183 (b) and (c) and § 214, both *supra,* they are, nevertheless, required to exercise such reasonable care and diligence as the circumstances of the case may impose. *M. & C. C. of Baltimore v. Fire Insurance Salvage Corps, supra.*

Exactly how much warning the leading driver should give of his intention to slow down or stop and what precautions the following driver should take to avoid a collision cannot be defined in a precise rule. Rather, as was said in *Brehm v. Lorenz,* 206 Md. 500, 112 A. 2d 475 (1955), the duties of the respective drivers are correlative in that the driver of the front vehicle must exercise ordinary care not to slow down or stop without giving the driver of the rear vehicle adequate warning of his intention and in that the driver of the rear vehicle must exercise ordinary care to avoid colliding with the front vehicle. Ordinarily, as it was in *Brehm,* the question as to which of the drivers involved in a rear-end collision neglected to use due care is for the jury to decide. To the same effect, see *Moore v. Reid,* 249 Md. 167, 238 A. 2d 874 (1968); *Clark v. Junkins,* 245 Md. 104, 225 A. 2d 275 (1967); *Christman v. Weil,* 196 Md. 207, 76 A. 2d 144 (1950); *Sieland v. Gallo,* 194 Md. 282, 71 A. 2d 45 (1950) and *Mitchell v. Dowdy,* 184 Md. 634, 42 A. 2d 717 (1945). Only in exceptional cases, where it is clear (as is the situation here) that reasonable minds would not differ with regard to the facts, will the question of negligence pass from the realm of fact to that of law. *Bernardi v. Roedel,* 225 Md. 17, 168 A. 2d 886 (1961).

Under the facts of this case, we think it is apparent that the automobile operator was free from contributory negligence and that the ambulance driver was negligent as a matter of law.

The salient facts are such as to indicate that reasonable minds would not differ as to the verdict. The ambulance driver admitted that he had been remiss in watching the intermittent red and green traffic control signal. He neglected to effectively brake the ambulance after he knew that the automobile had stopped. He correctly surmised that the automobile operator was unaware of the presence of the ambulance. And, what is more important, he did not forcefully apply the ambulance brakes until he was within eight to ten feet of the stopped automobile. Obviously, the ambulance driver did not exercise ordinary care to avoid colliding with the automobile.

We hold that the motion for judgment *n.o.v.* should have been granted.

> *Judgment for costs reversed; judgment n.o.v. granted; and case remanded for a new trial as to damages; the appellees to pay the costs.*